**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DONALD G. HYSELL,**                :

         **Plaintiff,**             :       **Case No. 2:06-cv-170**

         **v.**                       :       **Judge Holschuh**

**LICKING COUNTY SHERIFF**      :       **Magistrate Judge Kemp**
**RANDY THORP, et al.,**

                                :

         **Defendants.**

                                :

## OPINION AND ORDER

Plaintiff Donald Hysell filed suit against Licking County Sheriff Randy Thorp, Deputy Kris Kimble, Sergeant Chad Carson and Sergeant John Loy, seeking damages pursuant to 42 U.S.C. § 1983.  Plaintiff alleges that Defendants violated his Fourth Amendment right to be free from the use of excessive force during the course of an arrest.  A bench trial was held on August 11-13, 2008.  The parties then submitted post-trial briefs, along with proposed findings of fact and conclusions of law.  In accordance with Federal Rule of Civil Procedure 52(a)(1), the Court now enters its findings of fact and conclusions of law.  First, however, the Court must address several evidentiary issues on which the Court previously reserved ruling.

**I.**      **Evidentiary Issues**

     **A.**      **Motions in Limine**

The Court previously reserved ruling on four of Defendants' motions in limine.  When Defendants filed these motions, they referred to the exhibits as numbered in Appendix C to the Amended Final Pretrial Order.  When these exhibits were actually introduced at trial, however, Plaintiff renumbered them.  These numbering discrepancies are noted below.

1. **Defendants' Motion to Exclude Plaintiff's Exhibits 15, 16, and 25 (Doc. 60)**

Defendants moved to exclude Plaintiff's Exhibits 15, 16, and 25. Exhibit 15, the Licking County Sheriff's Office Directive 52.1 Regarding Internal Affairs – Administration, was introduced at trial as "Plaintiff's Exhibit 13." Plaintiff's Exhibit 16, the Licking County Sheriff's Office Directive 81.2 Regarding Communications – Operations, was introduced at trial as "Plaintiff's Exhibit 14." Although Defendants previously argued in their pretrial motion in limine that these two exhibits were irrelevant to a determination of whether Defendants had used excessive force against Plaintiff, these exhibits were both admitted into evidence at trial without any objection by Defendants. (Tr. at 230.)

Defendants also moved to exclude Plaintiff's Exhibit 25, "Additional Departmental Policies and Procedures," noting that, at that point, Plaintiff had not yet identified which additional policies he planned to introduce. At trial, Plaintiff neither introduced nor moved to admit any additional policies or procedures. Therefore, this objection appears to be moot. For these reasons, the Court **DENIES** Defendants' motion to exclude Plaintiff's Exhibits 15, 16, and 25 (Doc. 60).

2. **Defendants' Motion to Exclude Plaintiff's Exhibits 21-23 (Doc. 61)**

Defendants moved to exclude as irrelevant Plaintiff's Exhibit 21 -- the criminal complaint filed against Plaintiff, Exhibit 22 – the bill of particulars, and Exhibit 23 – the transcript of proceedings from Plaintiff's criminal trial. Plaintiff did not introduce the criminal complaint or the bill of particulars at trial. Although Plaintiff introduced the transcript of the proceedings from the criminal trial as "Plaintiff's Exhibit 21," he did not move to admit it into evidence. (Tr. at 231.) Defendants' motion to exclude these exhibits (Doc. 61) is therefore

**DENIED** as moot.

### 3. Defendants' Motion to Exclude Plaintiff's Exhibit 24 (Doc. 62)

Defendants also moved to exclude Plaintiff's Exhibit 24, "Photographs of Plaintiff, the Scene and Related Items." At trial, after Plaintiff introduced photographs of the scene as "Plaintiff's Exhibit 22," Defendants indicated that they had no objection to the admission of this particular exhibit. (Tr. at 231.) No other photographs were introduced into evidence. The Court therefore **DENIES** this motion (Doc. 62) as moot.

### 4. Defendants' Motion to Exclude Plaintiff's Exhibits 26-28 (Doc. 63)

Defendants also moved to exclude Plaintiff's Exhibits 26-28, the personnel files of Sergeant Carson (Ex. 26), Deputy Kimble (Ex. 27), and Sergeant Loy (Ex. 28). At the time the motion was filed, Defendants noted that Plaintiff had not yet identified which portions of the personnel files he intended to introduce. Defendants indicated that they may not object to the admission of certain documents contained in those files. Plaintiff did not introduce, or move to admit, any portion of the personnel files of Defendants Kimble or Loy at trial. As to the personnel files of those Defendants, the motion is therefore **DENIED** as moot. Plaintiff did, however, move to admit two documents that appear to be from Sergeant Carson's personnel file. At trial, Defendants objected to the admission of these documents. For the reasons stated below, the Court now **SUSTAINS** Defendants' objection.

The first document, which Plaintiff introduced as "Plaintiff's Exhibit 27," was a March 21, 2006 memo from Captain Tom Lee to Major Rod Mitchell concerning a complaint Lee had received about Sergeant Carson from Deputy Dan Loper, a fellow officer. Loper alleged that Carson had been very unprofessional and disrespectful while Loper was on the phone talking to

a civilian. Loper also alleged that Carson had been disrespectful to him concerning a request to work overtime. Captain Lee's memo stated that, under a new administration and a new Sheriff, he hoped that Loper's complaint would be taken seriously. Lee indicated that the previous Sheriff had denied requests to demote Sergeant Carson and/or remove him from the SWAT team. Lee stated that Carson had worked in the Patrol Division for 4-5 years and, although Carson was an excellent tactical leader, "when it comes to dealing with the people he works with and for on a day-to-day basis, he is a time bomb" and "rules by intimidation." (Pl.'s Ex. 27). Lee stated that during SWAT training earlier that month, Carson had shown disrespect for Lee and for Lee's supervisory position.

The second document, which Plaintiff introduced as "Plaintiff's Exhibit 28," was a Notice of Discipline, issued by Sheriff Randy Thorp to Sergeant Carson on August 3, 2006, in which Sheriff Thorp suspended Sergeant Carson for ten days without pay. Thorp found that Carson, in his interactions with Captain Lee and Deputy Loper as detailed in Captain Lee's March 21, 2006 memo, had violated Rule 19A, which requires employees to "treat their superior officers, subordinates, and associates with respect." Thorp noted that "[t]here is clear documentation dating back to 1999 that indicates you have been given notice, counseled, and reprimanded with time off without pay in 2004, for similar conduct." (Pl.'s Ex. 28).

Defendants have objected to the admission of these two documents on grounds of relevancy and hearsay. Because the Court agrees that these documents are irrelevant to Plaintiff's claims, the Court **GRANTS** Defendants' motion to exclude them from evidence. As Defendants note, these documents do not include any allegations that Sergeant Carson used excessive force against anyone (Tr. at 392-93); moreover, the incidents complained of took place

almost one year *after* Plaintiff's arrest. In the Court's view, the fact that Sergeant Carson may have a documented history of failing to treat his *coworkers* with respect does not tend to make it more likely that he used excessive force against Plaintiff during the course of Plaintiff's arrest. Moreover, because these documents do not allege that Sergeant Carson used excessive force against a citizen, they are also irrelevant to Plaintiff's official capacity claim against Sheriff Thorp. A failure to discipline Sergeant Carson for his failure to treat his coworkers with respect does not support a finding that the Licking County Sheriff's Office had a custom or policy of acquiescing in the use of excessive force against citizens.

### B.    Other Objections

#### 1.    Plaintiff's Objection to Defendants' Exhibits B-E (Doc. 67)

Plaintiff has objected to Defendants' Exhibits B, C, D, and E. These exhibits consist of written statements of witnesses Carolyn Blizzard, Beth Wolfe, Leesa Evans and Jennifer Johnson collected by Defendants at the scene. These women allegedly observed what had taken place in the school parking lot. Plaintiff argued that, to the extent Defendants intended to introduce these statements through the testimony of the officers, the statements were excludable as hearsay. Defendants countered that the statements were not hearsay because they were not being offered to prove the truth of the matter asserted, but rather to show what the officers knew at the time they first approached Plaintiff, a factor that must be considered in determining whether their conduct during the course of the arrest was objectively reasonable. The Court agrees that, to the extent the statements are being offered to show what the officers knew prior to Plaintiff's arrest, the statements would not constitute hearsay. However, not all of the statements are admissible under this theory.

Deputy Kimble and Sergeant Carson testified that the officers had all four written statements in their possession when they left the school property. (Tr. at 251, 313). Nevertheless, the officers had not necessarily read all of the statements prior to Plaintiff's arrest. Kimble testified that he remembers reading at least two of the statements before going to Plaintiff's property. (Tr. at 269). It can be reasonably inferred that he and Sergeant Carson each read Carolyn Blizzard's statement because they both asked her follow-up questions before confronting Plaintiff. (Tr. at 248, 313). Kimble remembers reading at least one of the other statements, but he did not identify which one it was. He admitted that he may not have read the other two statements prior to Plaintiff's arrest. (Tr. at 269). Neither Sergeant Loy nor Sergeant Carson testified about which witness statements, if any, they read prior to approaching Plaintiff.

Obviously, if the officers did not read a particular statement before they approached Plaintiff, the information contained in that statement cannot be within the scope of their knowledge. For this reason, the Court **SUSTAINS** Plaintiff's objection to Defendants' Exhibits C, D, and E, the written statements of Beth Wolfe, Leesa Evans and Jennifer Johnson. However, because the Court finds that Deputy Kimble and Sergeant Carson did read Carolyn Blizzard's statement before approaching Plaintiff, and because the information contained in that statement is not being offered for its truth, but rather to show the facts and circumstances relied upon by these two officers as they approached Plaintiff, this statement does not constitute hearsay as to the claims against Kimble and Carson. The Court therefore **OVERRULES IN PART** Plaintiff's objection to Exhibit B, the statement of Carolyn Blizzard. The statement has limited admissibility regarding the knowledge of Kimble and Carson prior to confronting Plaintiff. It is not admissible for any other purpose.

### 2.    Defendants' Objection to Plaintiff's Exhibit 26

"Plaintiff's Exhibit 26" consists of a chronological list of all citizen complaints filed against Licking County Sheriff's deputies from 2000-2004.  Sheriff Thorp testified that during those years, there were no citizen complaints involving use of excessive force.  (Tr. at 384-86). When Plaintiff's counsel moved to admit this exhibit, the Court stated that there was an objection to it, and that the Court would reserve ruling.  (Tr. at 394).

In their post-trial brief, Defendants argue that Exhibit 26 should be inadmissible because it is irrelevant to a determination of whether Defendants used excessive force against Plaintiff and irrelevant to a determination of whether the Licking County Sheriff's Office acquiesced in the use of excessive force by its officers.  In reviewing the trial transcript, however, the Court finds that it erred in stating that Defendants had objected to the admissibility of Plaintiff's Exhibit 26.  Defendants did not object to the admissibility of this exhibit at trial, and have therefore waived any objection.

### 3.    Defendants' Objection to Late Submission of Plaintiff's Exhibits

Immediately prior to the start of the trial, Defendants moved to exclude all of the documents that Plaintiff had neglected to provide prior to that morning.  Plaintiff argued that there were no documents that Defendants had not already seen, and that many of the exhibits were provided by Defendants themselves.  Plaintiff further noted that he had given Defendants a list of all of the potential exhibits and that there were no surprises.  Defendants conceded the accuracy of Plaintiff's statement, but noted that they did not know until that morning exactly which exhibits would be used.  The Court reserved ruling on this issue.

Federal Rule of Civil Procedure 26(a)(3)(A)(iii) requires a party to provide the other parties with "an identification of each document or other exhibit, including summaries of other evidence--separately identifying those items the party expects to offer and those it may offer if the need arises." Defendants have conceded that Plaintiff timely provided them with a list of all documents he might offer at trial. The Rule does not require Plaintiff to use all of the exhibits that are identified; nor does it require Plaintiff, prior to trial, to finalize the list of exhibits that will be introduced. Because the Court finds that Plaintiff complied with the applicable rule, the Court **OVERRULES** Defendants' objection to the admissibility of these exhibits.

### 4. Defendants' Objection to Relevance of 2001 Training Incident Involving Sergeant Carson

Defendants also objected to Sheriff Thorp's testimony concerning an April of 2001 training incident during which Sergeant Carson was accused of acting too aggressively toward a fellow officer. (Tr. at 211). Carson allegedly either kicked the officer in the ribs or knelt on him with enough force to partially deflate the officer's lung. Defendants contend that this evidence is irrelevant because the alleged use of excessive force occurred during a training incident with a fellow officer, not during the course of a citizen arrest. Moreover, the incident took place in 2001, four years prior to Plaintiff's arrest. The Court allowed the testimony at trial, reserving ruling on Defendants' objection.

The Court now **OVERRULES** that objection. The fact that the incident took place in 2001 and occurred outside the context of a citizen arrest goes to the weight of the testimony rather than its admissibility. The Court finds that this evidence is relevant to Plaintiff's official capacity claim against Sheriff Thorp in that it supports a finding that the Sheriff's Office was on notice that Sergeant Carson had a tendency to be overly physically aggressive.

8

## II. Defendants' Motion for Directed Verdict

At the close of Plaintiff's case-in-chief, counsel for Defendants moved for a "directed verdict" on Plaintiff's official capacity claim against Sheriff Randy Thorp and on the issue of qualified immunity for Defendants Carson, Kimble, and Loy. (Tr. at 233-241). Because this was a bench trial, the Court construes Defendants' motion as a motion for judgment on partial findings under Federal Rule of Civil Procedure 52(c). That Rule states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). As the Rule permits, the Court reserved ruling on the motion until the close of evidence. (Tr. at 241). The issues raised by Defendants in their oral motion are addressed below.

## III. Findings of Fact

The Court finds that the following facts have been established by a preponderance of the evidence.

### A. Background

Plaintiff Donald Hysell's property borders the gravel parking lot of Mary Ann Elementary School in Newark, Ohio. In fact, Plaintiff owns a small portion of that parking lot, which doubles as his driveway. (Tr. at 134; Pl.'s Ex. 22). Over the years, there has been some friction between Plaintiff and the school employees and parents who have occasionally blocked access to his driveway and parked on his grass.

On the afternoon of May 24, 2005, three Licking County Sheriff's Office employees responded to a call concerning a disturbance at the school. Deputy Kris Kimble, Sergeant Chad Carson and Sergeant John Loy interviewed several witnesses in the school parking lot.[1] The witnesses claimed that Plaintiff, then age 65, had damaged some of the vehicles in the school parking lot by hitting them with his tractor while he was mowing his grass. (Pl.'s Ex. 15; Tr. at 248-49).

The school custodian, Carolyn Blizzard, provided the officers with a written statement indicating that when she came out of the school to check to see if her car was damaged, Plaintiff said that he was going to have the cars towed because they were in his grass. Blizzard claimed that Plaintiff got off his tractor, yelled that he was "tired of [her] shit," and came towards her with his hands up in the air. She turned to go back into the school and told him that she was "tired of his shit." (Defs.' Ex. B; Tr. at 136). In response to written follow-up questions by Deputy Kimble and Sergeant Carson, Blizzard stated that Plaintiff ran after her in an aggressive manner, and that she felt threatened by him. (Defs.' Ex. B; Tr. at 313).

Kimble, Carson, and Loy then drove up Plaintiff's driveway to get his side of the story. (Tr. at 137, 252-53, 267, 291). They got out of their vehicles. When Plaintiff saw them approaching, he stopped mowing and walked over to see what they wanted. (Tr. at 43, 254). They met in a circle along a split rail fence and Deputy Kimble began to question Plaintiff. (Tr. at 42; Pl.'s Ex. 22).

There is some dispute about where the officers were standing relative to Plaintiff.

_____

[1] One of the witnesses interviewed was Leesa Evans whose husband, Darl Evans, was a sergeant with the Licking County Sheriff's Office. (Tr. at 30-33).

Plaintiff testified that even though Deputy Kimble did all of the questioning, Kimble stood behind Plaintiff's right shoulder the entire time, and Plaintiff never turned around to look at him. (Tr. at 144, 160-62). The Court finds that Plaintiff's testimony concerning this issue is not credible. Common sense dictates that when an officer questions a suspect, the two would face each other. Based on the testimony of the officers, the Court finds that Plaintiff stood along the fence, with the fence to his back. Kimble stood to Plaintiff's right, facing him. It is undisputed that Sergeant Carson was standing directly across from Plaintiff and Sergeant Loy was standing along the fence to Plaintiff's left. (Tr. at 44-45, 82, 160-61, 254-55, 292, 316).

Deputy Kimble asked Plaintiff if he knew anything about what had happened down at the school. Plaintiff said that he did not. When Kimble asked him if he had been mowing down by the parking lot, Plaintiff admitted that he had. Plaintiff then told Kimble that the vehicles were parked on his property. (Tr. at 62-63, 83, 112, 137, 279; Pl.'s Ex. 15 at 7). Kimble responded that the vehicles were parked in the gravel and, therefore, were not on Plaintiff's property. (Tr. at 114, 137; Pl.'s Ex. 15 at 6-7). Plaintiff became agitated and replied that the gravel was still his property. (Tr. at 138; Pl.'s Ex. 15 at 7). Kimble asked Plaintiff if he wanted to make a statement. Plaintiff said that he did not, and that he had done nothing wrong. (Tr. at 49, 85, 115, 137-38, 159, 256, 293, 317; Pl.'s Ex. 15 at 6-7). He gave the officers five minutes to leave his property. (Tr. at 49, 162, 256, 293, 317; Pl.'s Ex. 15 at 7).

At this point, Deputy Kimble told Plaintiff to put his hands behind his back because he was under arrest. (Tr. at 49, 116, 163; Pl.'s Ex. 15 at 6-7). Plaintiff admittedly did not comply with Kimble's request. (Tr. at 164, 257, 318; Pl.'s Ex. 15 at 6). Instead, Plaintiff gestured with his arms at his side, palms facing up, and asked "For what?" (Tr. at 138, 144). Kimble told him

he was under arrest for criminal damaging and menacing.  (Tr. at 49, 86-87, 257; Pl.'s Ex. 15 at 6).

### B.    Alleged Uses of Force

The parties gave differing accounts about what happened next.  Defendants, however, agreed that throughout the encounter, Plaintiff made no verbal threats, engaged in no violent behavior, and did not actively resist arrest.  (Tr. at 36-37, 76-77, 108).

According to Plaintiff's testimony, Deputy Kimble immediately struck him in the back of the head, knocking him partway over the split rail fence.  (Tr. at 138, 144).  As Plaintiff was straightening back up, one of the officers allegedly grabbed him, swung him around, and threw him face-first on the ground.  (Tr. at 138, 145, 168).  Plaintiff testified at an earlier deposition, and again at trial, that it was Deputy Kimble who did this.  However, at trial, Plaintiff also admitted that he did not really know which officer took him to the ground.  (Tr. at 169-74).  According to Plaintiff, all three officers then jumped on top of him, and Kimble again ordered him to put his hands behind his back.  He told Kimble that he couldn't put his hands behind his back because the officers were on top of him.  The officers then jerked his arms out from under him, pulled them up behind him and cuffed him.  (Tr. at 138, 145, 164).

According to Defendants' testimony, once Kimble told Plaintiff that he was under arrest and asked him to put his hands behind his back, Plaintiff turned slightly to his left, away from Kimble, pulled his hands in front of him, and started to step toward Sergeant Loy.  (Tr. at 39, 87-88, 107, 258-59, 270, 294-95, 318; Pl.'s Ex. 15 at 6).  Loy felt threatened and redirected Plaintiff toward Sergeant Carson.  (Tr. at 109, 119, 295).  Deputy Kimble then shoved Plaintiff in the back from behind, forcing him up against the split rail fence.  (Tr. at 49-51, 89-90, 120, 263,

12

272). Kimble testified that he forced Plaintiff into the fence in order to stabilize him so that they would not have to take him to the ground. (Tr. at 89-90, 258-60).

Defendants testified that Plaintiff then turned around to face them. (Tr. at 54, 320-21). Carson testified that he could tell that Plaintiff was not going to cooperate. He believed that it would be safer if they took him to the ground. (Tr. at 324-25). Carson did not give Plaintiff the opportunity to voluntarily get on the ground. (Tr. at 55). Instead, when Plaintiff turned around to face them, Sergeant Carson grabbed Plaintiff's left arm and Deputy Kimble grabbed Plaintiff's right arm. (Tr. at 56). Sergeant Carson used an arm bar hold and kicked Plaintiff's legs out from under him to force him face-first to the ground. (Tr. at 54, 92-93, 121, 296, 321). Carson's leg sweep inadvertently also took Deputy Kimble to the ground, knocking the wind out of him. (Tr. at 92-93, 322). Carson maintained a grasp on Plaintiff's left arm. Kimble, who had landed underneath Plaintiff, freed himself. (Tr. at 56, 260-61, 322). Carson then put his knee on Plaintiff's left side and tried to get Plaintiff's arms into cuffing position. (Tr. at 57). Deputy Kimble pulled Plaintiff's right arm out from under him and brought it around behind Plaintiff so that Carson could complete the handcuffing. (Tr. at 59-60, 94, 126, 262, 323).

Because all of this happened in a matter of seconds (Tr. at 321-24), it is not surprising that the parties have different recollections of exactly what happened. Based on the testimony presented at trial, the Court makes the following findings of fact. When Deputy Kimble told Plaintiff to put his hands behind his back because he was under arrest, Plaintiff, who was somewhat agitated at that point, asked "For what?" and gestured with his hands down at his sides. Kimble told him he was being arrested for criminal damaging and menacing. Instead of complying with Kimble's request to put his hands behind his back, Plaintiff turned his body

away from Kimble, pulled his arms in front of him, and started to step toward Sergeant Loy. Loy pushed him away. Deputy Kimble then shoved Plaintiff against the split rail fence. Kimble did not strike Plaintiff in the back of the head, but rather shoved him in the back. The shove caused Plaintiff to fall partway over the top rail of the fence.

The Court rejects Plaintiff's testimony that while he was still facing the fence, one of the officers grabbed him from behind and swung him around. It is undisputed that during the takedown maneuver that immediately followed, Sergeant Carson, who was standing across from Plaintiff and to Kimble's right, grabbed Plaintiff's left arm, and Kimble grabbed Plaintiff's right arm. Logic dictates that this would not have happened unless Plaintiff turned around, on his own volition, to face the officers. Moreover, Defendants had no reason to swing him around, since handcuffing could more easily be accomplished while Plaintiff was facing the fence.

After the officers grabbed Plaintiff's arms, Sergeant Carson used an arm bar hold and conducted a leg sweep, taking Plaintiff and Deputy Kimble face-first to the ground. Carson maintained a grasp on Plaintiff's left arm and put his knee on Plaintiff's left side. Kimble, who landed first, slid out from underneath Plaintiff and told Plaintiff to put his hands behind his back for cuffing. Plaintiff replied that he could not because his arm was pinned underneath him and the officers' weight was on top of him. (Tr. at 138, 164, 273). Although Plaintiff testified that all three deputies put their weight on him while he was on the ground, the Court finds that Sergeant Loy did not touch Plaintiff from the time Kimble shoved Plaintiff up against the fence until Loy helped Plaintiff up from the ground to escort him to the cruiser. Loy stood at Plaintiff's feet while Plaintiff was being handcuffed. (Tr. at 58, 123, 297-98).

When Plaintiff told Kimble that he could not put his hands behind his back because the officers were sitting on him, Kimble forced Plaintiff's right arm out from under his body and pulled it up behind him so that Carson could complete the handcuffing. As Kimble and Carson pulled Plaintiff's arms back, Plaintiff immediately felt a sharp pain in his lower right back. (Tr. at 146). The deputies helped Plaintiff to his feet, and searched his pockets before placing him in one of the cruisers. (Tr. at 138-39). The officers found a pocket knife in Plaintiff's pocket, but prior to that time, they did not know that he had it in his possession. (Tr. at 325).

Plaintiff was ultimately taken to the Licking County Sheriff's Office for booking, where he was charged with resisting arrest, menacing, and criminal damaging, all first degree misdemeanors. (Defs.' Ex. O; Tr. at 140-41, 266). All of the criminal charges were ultimately terminated in Plaintiff's favor. (Tr. at 144).

### C.      Plaintiff's Back Injury

Before being transported, Plaintiff complained of pain in his lower right back. (Tr. at 67, 96, 126, 139, 147, 175, 263, 299, 326-27). Because the Mary Ann Township Fire and EMS Station was located nearby, the officers drove Plaintiff to the station before taking him to the jail. (Tr. at 140, 264). Three volunteer paramedics offered to examine Plaintiff's back, but he refused their offer. He also refused their offer to take him to the hospital. (Tr. at 265, 326-28, 344-45, 356-57; Defs.' Ex. K). Plaintiff testified that he refused to be transported to the hospital because he could not afford to pay the medical bills. (Tr. at 140). Plaintiff did not complain of back pain while at the jail. (Tr. at 377).

Plaintiff had occasionally been treated by a chiropractor prior to this incident. (Tr. at 178). Plaintiff first sought treatment for his back pain stemming from this incident approximately six to seven weeks after his arrest. He visited Dr. Joseph Beckman, a chiropractor, on July 11, 2005. During that visit, Plaintiff told Dr. Beckman that he had been beaten by three deputy sheriffs and had lower right back pain. (Beckman Dep. at 8, 11-12).[2] Dr. Beckman diagnosed Plaintiff with lumbar strain, thoracic spinal pain, and sacroiliac strain. (Beckman Dep. at 9). Plaintiff visited Dr. Beckman again on July 13, 2005. Dr. Beckman also treated him on March 6, 2006, March 8, 2006, August 6, 2008, August 15, 2008, August 25, 2008, September 15, 2008, September 22, 2008, and September 29, 2008. (Tr. at 181-185).

Dr. Beckman testified that his findings were consistent with the findings of Dr. William Zerick, a neurological surgeon who examined Plaintiff on October 4, 2006 and submitted a report to Dr. Richard Donnard, Plaintiff's family physician.[3] (Beckman Dep. at 20-21, 38; Ex. 2 to Beckman Dep.). After reviewing an MRI of Plaintiff's lumbar spine, Dr. Zerick diagnosed a lumbar strain/sprain with age-appropriate degenerative arthritic changes.[4] (Ex. 2 to Beckman Dep.; Beckman Dep. at 20-22). Tests also revealed an old compression fracture. (Beckman Dep. at 28).

---

[2] By agreement of the parties, Dr. Beckman's deposition was taken after the bench trial and the transcript was attached as an exhibit to Plaintiff's post-trial brief.

[3] Dr. Zerick's report and Dr. Donnard's records are both attached as exhibits to Dr. Beckman's deposition. Defendants have objected on hearsay grounds to the admissibility of the findings contained in these exhibits. Defendants, however, failed to object to the introduction of these exhibits during Dr. Beckman's deposition and, in fact, cross-examined Dr. Beckman on this topic. Defendants have, therefore, waived any objection.

[4] Plaintiff does not claim that the degenerative arthritic changes were caused by Defendants' conduct. (Tr. at 188).

More than three years after the arrest, Plaintiff allegedly continues to suffer from chronic pain in his lower back. He has difficulty sleeping in a bed, and starts each morning in a hot tub. (Tr. at 148, 150). The chiropractic treatments provide some temporary relief (Beckman Dep. at 16), and he sometimes takes Vicodin to relieve the pain. (Tr. at 148). Dr. Beckman testified that he expects Plaintiff's alleged back pain to continue indefinitely. (Beckman Dep. at 25). Dr. Zerick recommended only continued conservative treatment, but noted that surgery may be warranted at some point in the future. (Tr. at 153; Ex. 2 to Beckman Dep.).

Plaintiff has always been an avid golfer. He continues to golf two or three times each week, but claims that his back injury has negatively affected his game. (Tr. at 151-52, 189). Plaintiff noted that following treatment for an aneurysm in his leg, another doctor told him to get plenty of exercise. (Tr. at 152). Dr. Beckman testified that although it is possible that golfing might aggravate Plaintiff's injury, it is also possible that the physical movement might help alleviate some of the pain. (Beckman Dep. at 36, 45).

Based on what Plaintiff told him, Dr. Beckman attributed Plaintiff's injury to the arrest incident. (Beckman Dep. at 13, 27-28). At his deposition, Dr. Beckman was asked to assume that: (1) Plaintiff had never complained of pain in his lower right back area prior to the arrest;[5] (2) the deputies placed weight on Plaintiff's body while he was lying face down on the ground; (3) at the same time, the deputies grabbed Plaintiff's arms and jerked them up and backward, causing Plaintiff's body to twist in the lower back area; and (4) at that moment, Plaintiff felt an immediate sharp pain in his lower right back. Assuming all of this to be true, Dr. Beckman

---

[5] Plaintiff testified that many years ago, while he was working for United Parcel Service, he pulled a muscle in the left side of his back, but fully recovered. (Tr. at 146).

testified that it was his opinion, to a reasonable degree of chiropractic certainty, that the use of force during the course of the arrest proximately caused Plaintiff's back injury. (Beckman Dep. at 17-18).

Defendants have presented absolutely no evidence to the contrary. They do, however, speculate that Plaintiff's back injury could have occurred while he was golfing during the six weeks between the date of his arrest and the date he first sought chiropractic treatment. They also speculate that Plaintiff's ongoing back pain may be caused by either his degenerative disc disease or his continued golfing. But again, they present no evidence to support these theories.

Based on the evidence presented at trial and in Dr. Beckman's deposition, the Court finds that Plaintiff has proved by a preponderance of the evidence that his lumbar strain/sprain was proximately caused by Defendants' conduct during the course of Plaintiff's arrest.

According to Dr. Beckman, Plaintiff paid co-payments totaling $42.33 in 2005 and 2006, and co-payments of $15.00 for each of his six visits in 2008. (Beckman Dep. at 26-27; Ex. 4 to Beckman Dep.). Plaintiff has presented no other evidence of medical bills related to his back injury. Plaintiff's out-of-pocket expenses to date therefore total $132.33.

### D.     Licking County Sheriff's Office Policies Regarding Use of Force

#### 1.     Use of Force Continuum

Licking County Sheriff's deputies are trained yearly in the use of force. (Tr. at 242-45, 289, 309, 364, 370). The officers are trained to use no more force than is necessary to effect an arrest. (Tr. at 193). The "Use of Force Continuum," on which the officers are trained, indicates that when a suspect is not responding to verbal commands or is exhibiting verbal or physical danger cues, appropriate responses may include officer presence, verbal or physical commands,

assistance from other officers, use of an escort position or balance displacement. When a suspect

pulls away from an officer or refuses to move, appropriate responses may include striking

muscle groups, take downs, joint manipulations or pressure points. Factors to be considered in

each case include the relative age, sex, size, skill level, and strength of the suspect and officer,

and the number of suspects and officers at the scene. (Defs.' Ex. N). As a general rule, suspects

are taken to the ground only when all standing efforts have been exhausted. (Tr. at 61).

### 2. Use of Force Reports

Licking County Sheriff's Office Directive 1.3.6 (Pl.'s Ex. 11) requires that officers

complete a "Use of Force" form each time force is used. These forms are reviewed by the Major

who, at his discretion, determines whether the incident should be referred to the internal affairs

process for an investigation. (Tr. at 194, 225, 228, 368).

In this case, Deputy Kimble completed a "Use of Force" form, which stated only that he

and Sergeant Carson "had to physically hold down subject to cuff." (Pl.'s Ex. 16). The form

mentions nothing of Kimble's shove against the fence, or of Carson's leg sweep. Carson and

Kimble admitted at trial that the shove and the leg sweep should have been documented but were

not. (Tr. at 51-53, 100-01).

### 3. Incident Reports

Kimble and Loy each also completed an Incident Report concerning Plaintiff's arrest.

(Pl.'s Ex. 15). Sergeant Carson approved Deputy Kimble's report.[6] Deputy Kimble wrote that

Plaintiff refused to comply with his order to place his hands behind his back, and turned away

---

[6] On the day of the arrest, Sergeant Loy and Sergeant Carson were Kimble's supervisors.
(Tr. at 52, 104).

from him. Kimble stated, "[a]t this time Sgt. Carson and Sgt. Loy and myself had to physically restrain Donald. While trying to place my cuffs on Donald, myself and the suspect fell to the ground, damaging my uniform. Sgt. Carson was then able to cuff Donald." (Pl.'s Ex. 15 at 6).[7] Sergeant Loy wrote that when Deputy Kimble went to grab Plaintiff's arm, Plaintiff told him he "wasn't going nowhere." According to Loy, Plaintiff "then became combative with us and had to be forced to the ground to be handcuffed." (Pl.'s Ex. 15 at 7).[8] Neither report mentions that Deputy Kimble shoved Plaintiff up against the split rail fence. (Tr. at 100, 127). Although Loy's report states that Plaintiff "had to be forced to the ground," it does not mention that Carson used an arm bar hold and conducted a leg sweep.

### 4. Plaintiff's Complaint

Following Plaintiff's arrest, David Stokes, Plaintiff's attorney, wrote a letter to Sheriff Thorp asking him to investigate the officers' alleged use of excessive force. Plaintiff did not file a signed, written complaint giving his version of what happened during the course of the arrest. (Tr. at 142-43, 177, 371). Plaintiff did, however, go to the Sheriff's Office and spoke to Captain Lee, who was Defendants' supervisor. (Tr. at 209). He told Lee about what had happened during the course of his arrest. Lee said that he would need to speak to the deputies to get their side of the story. Plaintiff told Lee that there would probably be a lawsuit, and said that he wanted to take a polygraph test. Lee said that he would schedule one, but Plaintiff never heard

---

[7] At trial, Deputy Kimble testified that at the time he wrote the report he honestly thought that the fall was accidental. (Tr. at 100).

[8] At trial, Sergeant Loy admitted that Plaintiff was not "combative" as that word is commonly understood. Plaintiff did nothing "forceful, violent, threatening, aggressive." (Tr. at 303-04).

back from him.  (Tr. at 142-43, 177-78).

Licking County Sheriff's Office Directive 52.1.1(A) states that "[a]ll allegations of employee misconduct will be appropriately investigated and promptly settled."  Subsection (F) states that all complaints are to be investigated regardless of whether a signed, written complaint is filed.  (Pl.'s Ex. 13; Tr. at 197).  Complaints of use of excessive force are considered to be major complaints that are to be forwarded to the Chief Deputy or his designee for investigation. (Pl.'s Ex. 13; Tr. at 199, 215).

Sheriff Thorp testified that he did not know that Plaintiff spoke to Captain Lee. (Tr. at 210).  However, with respect to Attorney Stokes' letter, Thorp acknowledged its receipt and promised to investigate the complaint.  Thorp then referred the matter to Major Rod Mitchell. (Tr. at 371-72).  Mitchell maintains that he attempted to contact Plaintiff to interview him but could not locate him.  (Tr. at 219).  Mitchell also testified that he pulled the incident reports completed by the officers, and spoke informally to Sergeant Carson, Sergeant Loy, and Deputy Kimble about what had happened.  (Tr. at 223-24).  Despite Mitchell's testimony, Carson, Loy, and Kimble all testified that no one ever questioned them about Plaintiff's complaint.  (Tr. at 70, 101, 124-25).

In any event, Mitchell reported to Thorp that he had conducted an investigation and found the complaint to be unfounded.  (Tr. at 224, 373).  Thorp instructed Mitchell to write a follow-up letter to Plaintiff's attorney as required by Licking County Sheriff's Office Directive 52.1.5 (Pl.'s Ex. 13; Tr. at 200), but Mitchell failed to do so.  (Tr. at 373).  Thorp did not know that Mitchell failed to adequately investigate the matter and failed to follow up with Stokes. Mitchell was not disciplined.  (Tr. at 206, 373).

The Court finds that, even though Plaintiff made oral and written requests, no meaningful investigation was conducted concerning Plaintiff's complaint. Moreover, although Licking County Sheriff's Office Directives required that the deputies be given written notification of any complaint made against them (Directive 52.1.6(D)) and be notified of the outcome of the investigation (Directive 52.1.9) (Pl.'s Ex. 13), in this case the defendant officers received neither. (Tr. at 198, 201-02).

## IV.    Conclusions of Law

### A.    42 U.S.C. § 1983

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983. That statute states: "Every person who, under color of any statute, ordinance, regulation, custom or usage of any state . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party. This statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Graham v. Connor, 490 U.S. 386, 393-94 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3 (1979)). In order to recover under § 1983, a plaintiff must prove that the defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).

In this case, Plaintiff contends that in effecting his arrest on May 24, 2005, Defendants Kimble, Carson, and Loy used excessive force in violation of the Fourth Amendment to the

United States Constitution.[9]  That amendment secures the right of the people to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Plaintiff also contends that the alleged constitutional violation was caused, in large part, by the failure of Licking County Sheriff Randy Thorp and his predecessor to adequately discipline officers for previous uses of excessive force.

Plaintiff has sued Deputy Kimble, Sergeant Carson, and Sergeant Loy in their individual capacity, and has sued Licking County Sheriff Randy Thorp in his official capacity.[10]  As the Supreme Court noted in <u>Kentucky v. Graham</u>, 473 U.S. 159 (1985), a claim brought against a government employee in his or her *individual* capacity seeks to hold the employee personally liable for actions taken under color of state law.  However, a claim brought against a government employee in his or her *official* capacity is the equivalent of a claim brought against the governmental entity itself.  <u>Id.</u> at 165-66.

### B.        Claims Against Carson, Kimble, Loy in Their Individual Capacity

The Court turns first to the claims brought against the officers in their individual capacity.  With respect to these claims, Defendants have asserted the defense of qualified immunity.  According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their

---

[9]  It is undisputed that on the afternoon in question, the defendant officers were acting under color of state law in their capacity as employees of the Licking County Sheriff's Office. There is, however, a dispute about whether Defendants violated Plaintiff's Fourth Amendment rights by engaging in the use of excessive force.

[10]  Plaintiff initially also sued Sheriff Thorp in his individual capacity, but has pursued only the official capacity claim.

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  As the

Supreme Court noted in  Saucier v. Katz, 533 U.S. 194 (2001):

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on
> particular police conduct. It is sometimes difficult for an officer to
> determine how the relevant legal doctrine, here excessive force,
> will apply to the factual situation the officer confronts. An officer
> might correctly perceive all of the relevant facts but have a
> mistaken understanding as to whether a particular amount of force
> is legal in those circumstances. If the officer's mistake as to what
> the law requires is reasonable, however, the officer is entitled to
> the immunity defense.

Id. at 205.

The doctrine of qualified immunity encompasses not only immunity from liability, but

also immunity from the burdens of  litigation.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985);

Saucier, 533 U.S. at 200-01.  In order to avoid the cost of discovery and trial preparation, it

therefore makes sense for a defendant to assert this defense early in the litigation.  Likewise,

courts are encouraged to resolve the qualified immunity issue as early as possible.  Hunter v.

Bryant, 502 U.S. 224, 228 (1991).

In this case, however, Defendants did not assert the qualified immunity defense in a

pretrial motion.  They pled qualified immunity as an affirmative defense in their Answer, but did

not present it to the Court until the close of Plaintiff's case at trial when they moved for

judgment on partial findings.  The Court reserved ruling on Defendants' motion until the close of

the evidence.  Although Defendants lost the main benefit of the defense by not asserting it earlier

in the litigation, the qualified immunity defense is one that may be raised at any time, including

as an affirmative defense at trial.  See English v. Dyke, 23 F.3d 1086, 1089 (6th Cir. 1994).

Once the defense is raised, the plaintiff has the burden of proving that the defendant is not entitled to qualified immunity. See Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006).

The qualified immunity analysis involves a two-step inquiry. As the Sixth Circuit has explained:

> First, the court must ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" Saucier, 533 U.S. at 201, 121 S.Ct. 2151. If the answer is yes, then the court must go on to ask whether the right was clearly established. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151.

Nader v. Blackwell, 545 F.3d 459, 473 (6th Cir. 2008) (footnote omitted).[11]

### 1.      Constitutional Violation

With respect to the first prong of the qualified immunity analysis, because of the current procedural posture of this case, the question is not whether the facts *as alleged* show a constitutional violation, but rather whether the facts *as found by this Court* following a bench trial on the merits establish a constitutional violation. See Spier v. Elaesser, 267 F. Supp.2d 806, 811 (S.D. Ohio 2003) (noting that the relevant inquiry following a bench trial is whether the facts as found by the court show that the officer's conduct violated plaintiff's constitutional rights). See also Kerman v. City of New York, 374 F.3d 93, 119 (2d Cir. 2004) (holding that once a jury has resolved relevant factual disputes, the Court's legal ruling on the question of

---

[11] The Supreme Court very recently held that courts are no longer required to consider these two questions in this particular order. Pearson v. Callahan, -- S.Ct.--, 2009 WL 128768, at *9 (U.S. Jan. 21, 2009). However, it also noted that this sequence is still "often appropriate." Id. In this case, the Court sees no reason to vary the standard approach.

qualified immunity must be based "on the facts as found by the jury"); Acevedo-Garcia v. Monroig, 351 F.3d 547, 563 (1st Cir. 2003) ("The availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment.").

Because of the unique procedural posture of this case, the first prong of the qualified immunity analysis necessarily merges with the Court's decision on the underlying merits of Plaintiff's claims that the officers used excessive force against him. If the Court finds that the officers did, in fact, violate Plaintiff's constitutional rights, the Court must then go on to consider the second prong of the qualified immunity test. If the officers engaged in excessive force, but the relevant law was not clearly established, they cannot be held liable.

The Court turns now to the question of whether the officers used excessive force against Plaintiff during the course of his arrest. In effecting an arrest, officers are entitled to use some degree of physical force, but they may use only as much force as is reasonably necessary. See Graham v. Connor, 490 U.S. 386, 396 (1989); Monday v. Oullette, 118 F.3d 1099, 1104 (6th Cir. 1997); .

In Graham, the Supreme Court held that claims of excessive force must be analyzed using a standard of "objective reasonableness." 490 U.S. at 388. The individual's Fourth Amendment interests must be carefully balanced against the "countervailing governmental interests at stake." Id. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." Id. The Court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and

whether he is actively resisting arrest or attempting to evade arrest by flight." Id. This list of factors is not exhaustive. Ultimately, the Court must determine "whether the totality of the circumstances justified a particular sort of . . . seizure." Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).

In determining whether a use of force is excessive, the court must view it "from the perspective of a reasonable officer on the scene," keeping in mind that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97. The ultimate question "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397.

The first factor that must be considered is the severity of the crime at issue. Id. at 396. In this case, Plaintiff was arrested for criminal damaging and menacing, first degree misdemeanors.[12] Under the facts presented here, neither of these can be considered violent or severe crimes.

The second factor to be considered is whether the suspect poses an immediate threat to the safety of the officers or others. Id. In this case, because there were no other people in the immediate vicinity where Plaintiff was arrested, the only question is whether he posed an immediate threat to the safety of the officers.

---

[12] Although the Licking County Sheriff's Office policy generally requires officers to arrest individuals suspected of committing felonies, officers have discretion to arrest individuals for committing misdemeanors. Factors to be considered in deciding whether to make an arrest include the individual's prior criminal history, the possibility of further violence, the likelihood that the suspect will appear before the court, and public reaction. (Pl.'s Ex. 10; Tr. at 192).

As noted earlier, the Use of Force Continuum indicates that factors to be considered in determining how much force is appropriate include the relative age, sex, size, skill level, and strength of the officer and the suspect, as well as the number of suspects in comparison to the number of officers. (Defs.' Ex. N). In this case, there were three officers and one suspect. On the date of the incident in question, Plaintiff was 65 years old. It appears that all three officers were considerably younger than he was. Plaintiff is almost 6 feet tall and weighs approximately 205. (Tr. at 167-68). Sergeant Carson is approximately 6 feet tall and weighs approximately 230 pounds. (Tr. at 34). Deputy Kimble is approximately 6 feet tall and weighs approximately 225 pounds. (Tr. at 75). Sergeant Loy is approximately 5'8" tall and weighs approximately 170 pounds. (Tr. at 106). All three officers had received extensive police training, and had been trained to serve on the county's SWAT team. (Tr. at 34, 75, 107).

The officers testified that even though Plaintiff was not at all violent and made no verbal threats against them, they nevertheless feared for their safety because he refused to comply with Kimble's order to place his hands behind his back, and because he stepped away from Kimble toward Loy. (Tr. at 36-39, 76, 78, 95, 109, 295).

In the Court's view, under the circumstances presented here, Plaintiff posed little or no immediate threat to the safety of the officers. They outnumbered him three-to-one and were much younger than he was. Two of the three officers were larger than he was, and all had been trained as SWAT team members and were carrying guns. Although Plaintiff was in possession of a pocket knife, there is no evidence that he intended to use it as a weapon. Moreover, Plaintiff was standing with his back to a fence, surrounded by three police officers who were all standing just a few feet away.

The final Graham factor to be considered is whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight.  490 U.S. at 396.  The officers all admitted that Plaintiff was not actively resisting arrest.  (Tr. at 36-37, 77, 107-08).  He simply failed to obey Kimble's order to place his hands behind his back.  Even though Plaintiff turned away from Deputy Kimble once Kimble told him he was under arrest, it cannot be said that Plaintiff was attempting to evade arrest by flight.  He was on his own property, surrounded by three armed officers who were in very close proximity to him.  Moreover, when he turned, he turned toward the split rail fence.  Although he may have taken a step or two away from Deputy Kimble and toward Sergeant Loy, there is no evidence to support a finding that he intended to flee.

The Court finds that, in general, the Graham factors weigh heavily in Plaintiff's favor.  He was arrested only for misdemeanor offenses, he posed no immediate threat to the safety of the officers or others, and he was not actively resisting arrest or attempting to flee.  When Plaintiff's Fourth Amendment interests are balanced against the countervailing governmental interests in this case, there appears to be little justification for the amount or type of force that was used against him.  With this in mind, the Court turns to a more in depth analysis of what happened during the course of Plaintiff's arrest.

The Sixth Circuit has held that, in analyzing excessive force claims, the officers' conduct during the course of an arrest should be viewed in segments.  The Court must determine whether the officers' conduct at each juncture of the encounter was objectively reasonable and constitutionally permissible.  See Dickerson v. McClellan, 101 F.3d 1151, 1161-62 (6th Cir. 1996).  In this case, Plaintiff divides the officers' conduct during the course of his arrest into three separate segments.  He alleges that excessive force was used: (1) when Deputy Kimble

struck Plaintiff from behind, knocking him into, and partially over, the nearby fence; (2) when Sergeant Carson took Plaintiff by the arm and used a leg sweep to take Plaintiff face-first to the ground; and (3) when Deputy Kimble, Sergeant Carson, and perhaps Sergeant Loy, placed weight on Plaintiff's back and pulled his arms behind him, twisting and causing injuries to his lower back while attempting to handcuff him.

### a. First Use of Force: Shoving Against Fence

The first alleged use of excessive force occurred when Deputy Kimble shoved Plaintiff up against the split rail fence. This occurred immediately after Plaintiff refused to comply with Deputy Kimble's command to put his hands behind his back. Plaintiff turned away from Deputy Kimble toward Sergeant Loy and Sergeant Loy redirected him toward Sergeant Carson. Deputy Kimble previously testified that he pushed Plaintiff "into the fence to stabilize him, so we would not have to go to the ground." (Tr. at 91).

Plaintiff admitted that Kimble's shove was not forceful enough to cause any damage to the fence (Tr. at 167), and Plaintiff has not claimed that he suffered any injuries as a result of being shoved by Kimble. As the Supreme Court noted in Graham, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." 490 U.S. at 396. The Use of Force Continuum, on which the officers are trained, indicates that when a suspect fails to respond to verbal commands, balance displacement and physical commands may be appropriate. (Defs.' Ex. N). The Court finds that because Plaintiff had refused to comply with Kimble's order, and had turned away from him, Kimble's conduct in shoving Plaintiff up against the split rail fence in order to stabilize him was objectively

reasonable and constitutionally permissible.[13]

### b.    Second Use of Force: Takedown Maneuver

The second alleged use of excessive force occurred just seconds later.  As the Court previously found, Plaintiff pushed himself off the fence and turned around to face the officers. At that point, Kimble grabbed Plaintiff's right arm and Carson grabbed Plaintiff's left arm. Carson then immediately used an arm bar hold and conducted a leg sweep which caused Plaintiff to fall face-first to the ground.

The Court finds that Sergeant Carson's conduct was objectively unreasonable and constituted a use of excessive force.  Carson testified that he was trained that it was appropriate to take a suspect to the ground "usually when all standing efforts have been exhausted."  (Tr. at 61).  Here, it cannot be said that all standing efforts had been exhausted when Carson conducted the takedown maneuver.  Between the time Kimble shoved Plaintiff against the fence and the time Carson forced Plaintiff to the ground, no one repeated the command for Plaintiff to put his hands behind his back.  Moreover, Carson admitted that he gave Plaintiff no opportunity to voluntarily get on the ground.  (Tr. at 55-56).  Instead, Carson grabbed Plaintiff's arm and immediately used pain compliance techniques and a leg sweep to force him face-first to the

---

[13]  Plaintiff has also argued that Kimble acted in retaliation for Plaintiff's speech, shoving him immediately after Plaintiff questioned why Kimble was placing him under arrest.  Citing City of Houston v. Hill, 482 U.S. 451 (1987), Plaintiff notes that citizens have a First Amendment right to criticize police officers, and it is unlawful for an officer to retaliate by using force in response to speech.  The Court, however, finds that Kimble shoved Plaintiff to the fence not because Plaintiff questioned Kimble's decision to arrest him, but rather because Plaintiff refused to comply with his order and then turned away from him.

ground.[14]  Carson testified that he did so because "it was apparent that he was not going to cooperate," and it was "safer" to have him on the ground and "easier to control his movements." (Tr. at 56, 324).

In the Court's view, contrary to Carson's testimony, it was not "apparent" that Plaintiff was going to refuse to cooperate.  Carson jumped to this conclusion much too quickly.  Perhaps most tellingly, Carson's takedown maneuver caught Deputy Kimble, his fellow officer, completely by surprise.  Kimble testified that he shoved Plaintiff into the fence "to stabilize him, *so we would not have to go to the ground*."  (Tr. at 91) (emphasis added).  When Plaintiff turned back around, Kimble grabbed Plaintiff's right arm.  Kimble testified that he did not anticipate the takedown maneuver.  Like Carson, he had been trained to take an arrestee to the ground only after all standing efforts had been exhausted.  (Tr. at 81).  In this case, he "just wasn't ready" and "didn't see it coming."  (Tr. at 93).  When Carson conducted the leg sweep, Kimble was knocked to the ground with such force that he "got the wind knocked out of [him]."  (Tr. at 93).

The Sixth Circuit has held that in determining whether a use of force is unlawful, the court may consider whether an officer acted contrary to the training the officer received.  See Griffith v. Coburn, 473 F.3d 650, 657 (6th Cir. 2007).  In this case, the officers were trained to take a suspect to the ground only after all standing efforts had been exhausted.  In addition, the Use of Force Continuum indicates that takedown maneuvers may be justified when a suspect pulls away from an officer or becomes like dead weight and refuses to move.  (Defs.' Ex. N).

---

[14]  Because Carson intentionally engaged in a takedown maneuver, this case is factually distinguishable from Thacker v. Lawrence County, No. 05-3652, 2006 WL 1359971, at **7 (6th Cir. May 17, 2006), cited by Defendants, in which the officers and the suspect accidentally fell to the ground while the officers were effecting the arrest.

There is no evidence that Plaintiff was refusing to move and, at the time Carson took Plaintiff to the ground, Plaintiff was not pulling away from an officer. Kimble had just shoved him against the fence, but was not holding onto him at that point. When Plaintiff turned back around to face the officers, there is no evidence to suggest that he intended to cause them harm or that he was attempting to flee. Carson therefore acted contrary to departmental policy when he engaged in the takedown maneuver. Moreover, the fact that the takedown maneuver was not documented in the incident reports or the Use of Force report suggests that the officers were trying to cover up Carson's wrongdoing.

At the time Sergeant Carson conducted the leg sweep, Plaintiff was not actively resisting arrest or attempting to flee. He was not engaging in any violent behavior or threatening the officers in any way. Moreover, he was within arm's reach of all three police officers and had his back to the fence. The officers could have easily reached out and grabbed Plaintiff's arms to bring him within their physical control. Under these circumstances, the Court cannot find that it was objectively reasonable for Sergeant Carson to force Plaintiff face-first to the ground. The Court therefore finds that Sergeant Carson used excessive force during this segment of Plaintiff's arrest.

### c.    Third Use of Force: Handcuffing

Finally, Plaintiff argues that excessive force was used when Deputy Kimble, Sergeant Carson, and perhaps Sergeant Loy, placed weight on his back and pulled his arms behind him, twisting them and causing injuries to his lower back while attempting to handcuff him. The Court notes that this segment of Plaintiff's arrest clearly flows from the previous segment. But for Sergeant Carson's takedown maneuver, Plaintiff would not be on the ground and there would

have been no need to force Plaintiff's arms up behind his back in order to handcuff him.

As an initial matter, the Court has already found that Sergeant Loy did not directly participate in handcuffing Plaintiff.  Loy stood at Plaintiff's feet during the entire time.  Because Sergeant Loy did not engage in the use of excessive force as alleged, he did not violate Plaintiff's constitutional rights.  Loy is therefore entitled to qualified immunity on this particular claim.[15]

The Court, however, finds that Deputy Kimble and Sergeant Carson used excessive force in handcuffing Plaintiff.  As the Court has previously found, Sergeant Carson was kneeling on Plaintiff's back and was holding Plaintiff's left arm in a cuffing position.  Plaintiff's right arm was still pinned underneath him from the fall.  Therefore, when Deputy Kimble again ordered Plaintiff to put his hands behind his back, Plaintiff told him that he was not able to do so. Kimble and Carson made no effort to shift their weight to give him the opportunity to voluntarily pull his arm out and submit to the handcuffing.  Instead, they assumed that he was simply unwilling to cooperate.  (Tr. at 95, 262, 298).  Kimble therefore forced Plaintiff's right arm out from underneath him and then pulled it up behind his back.  Carson, who was still holding Plaintiff's left arm, then completed the handcuffing.  It was at this instant that Plaintiff felt a sharp pain in his right lower back. Under the circumstances presented here, the officers engaged in a use of excessive force, both in the unnecessary takedown maneuver and in the handcuffing of Plaintiff.

---

[15]  Plaintiff also alleges that Sergeant Loy is liable as a supervisor for failing to intervene in the alleged use of excessive force.  This claim will be addressed below.

### d.       Supervisory Liability of Carson and Loy

In addition to claiming that Kimble, Carson and Loy are liable for actively participating in the use of excessive force during the course of his arrest, Plaintiff also argues that Carson and Loy are liable as supervisors under § 1983 because they failed to prevent the use of excessive force by the other officers.  The Sixth Circuit has held that:

> a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring.

Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997).

In this case, because Sergeant Carson actively participated in each of the segments of Plaintiff's arrest in which the Court found that excessive force was used, *i.e.*, the takedown maneuver and the handcuffing, there is no need to consider whether he might, in the alternative, be liable as a supervisor.

With respect to Sergeant Loy, the Court finds that he did observe Sergeant Carson and Deputy Kimble using excessive force against Plaintiff.  However, because the takedown maneuver and subsequent handcuffing occurred within a matter of a few seconds, and because the takedown maneuver was completely unexpected, the Court finds that Sergeant Loy had no opportunity to prevent the harm from occurring.  Therefore, Plaintiff has failed to establish a claim of supervisory liability against Sergeant Loy.

### 2.       Law Clearly Established

To summarize, the Court finds that Sergeant Carson violated Plaintiff's Fourth Amendment rights when he used the arm bar hold and leg sweep to take Plaintiff to the ground.

The Court also finds that Sergeant Carson and Deputy Kimble violated Plaintiff's Fourth Amendment rights when they subsequently forced Plaintiff's arms up behind his back in order to handcuff him.

Having found that these officers engaged in excessive force, the Court turns next to the second prong of the qualified immunity analysis, *i.e.*, whether the constitutional right was clearly established. As discussed earlier, if the right at issue was not clearly established, then the officers are not liable even though they engaged in unlawful conduct.

It is not enough that Plaintiff had a clearly established right to be free from the use of excessive force during the course of his arrest. Rather, the constitutional right allegedly violated "must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

In this case, Plaintiff was accused of committing two misdemeanors. He was not actively resisting arrest and posed no immediate threat to the officers or anyone else. Under these circumstances, no reasonable officer would have believed that it was lawful to conduct a leg sweep, knocking Plaintiff face-first to the ground. Likewise, no reasonable officer would have believed that it was lawful to forcefully jerk Plaintiff's arms behind him, twisting his lower back and causing him injury.

It is clearly established that when an arrestee is not violent and poses no immediate threat to the safety of the officers or others, officers are not entitled to inflict unnecessary pain. See St. John v. Hickey,  411 F.3d 762, 774 (6th Cir. 2005) ("the right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest was clearly established as of

November 9, 2000"); <u>Griffith</u>, 473 F.3d at 659; <u>Shreve v. Jessamine County Fiscal Court</u>, 453 F.3d 681, 688 (6th Cir. 2006)("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest.").

More specifically, the Sixth Circuit has held that unless the suspect poses a tenable threat to the officers' safety, it is objectively unreasonable to throw the suspect to the ground. <u>See Lyons v. City of Xenia</u>, 417 F.3d 565, 578 (6th Cir. 2005). The Sixth Circuit has also held that the "right to be free from 'excessively forceful handcuffing' is a clearly established right for qualified immunity purposes." <u>Burchett v. Kiefer</u>, 310 F.3d 937, 944 (6th Cir. 2002) (<u>citing Kostrzewa v. City of Troy</u>, 247 F.3d 633, 641 (6th Cir. 2001)).

The Court finds instructive the case of <u>Solomon v. Auburn Hills Police Department</u>, 389 F.3d 167 (6th Cir. 2004). A police officer insisted that Francine Solomon leave a movie theater because she had purchased tickets for one movie, but had gone to see another. When she refused to leave, the officer told her she was under arrest for trespassing. He grabbed her arm and she allegedly kicked him. He then told her she was under arrest for assaulting a police officer. She agreed to follow him and another officer to the lobby of the theater. On the way to the lobby, one of the officers grabbed her arm and unsuccessfully attempted a leg sweep. Solomon crossed her arms and asked why he was doing that to her. The officers then grabbed her arms and slammed her against a wall. They put handcuffs on her right hand. One of the officers then pinned her against the wall and forcibly bent her left arm behind her, breaking her elbow in several places.

The Sixth Circuit noted that Solomon was not a flight risk; her children were standing with her in the lobby. Nor was she actively resisting arrest or attempting to flee. Moreover, she

had committed a minor offense.  She was not armed and posed no immediate threat; in fact, Solomon was considerably smaller than the two police officers.  Id. at 173-74.  The Court concluded that under these circumstances, "no reasonable officer would find that . . . the arrest of Solomon required the extreme use of force that was used here."  Id. at 175.  The Court characterized the attempted leg sweep, the shove into the wall, and the yanking of Solomon's arm behind her back as "unnecessary, unjustifiable and unreasonable force" and concluded that the officer was not entitled to qualified immunity.  Id.

There are numerous similarities to Plaintiff's case.  Like Solomon, Plaintiff was accused of committing a minor offense, he posed no immediate safety risk, and he was not actively resisting arrest or attempting to flee.  In addition, he was surrounded by three armed officers, two of whom were bigger than he was.  Although Plaintiff passively resisted arrest by refusing to put his hands behind his back, no reasonable officer would have believed that it was lawful or necessary to force him to the ground, put weight on him, and then jerk his arms behind his back to cuff him.

In the Court's view, the law of this circuit, as it existed on the date of Plaintiff's arrest, put Defendants on fair notice that their conduct in effecting his arrest was unlawful.  Because the law was clearly established, the Court concludes that Deputy Kimble and Sergeant Carson are not entitled to qualified immunity.

## C.     Claims Against Sheriff Randy Thorp in his Official Capacity

As noted above, a claim brought against a government official in his official capacity is the equivalent of a claim against the governmental entity itself.  Section 1983 claims against governmental entities are governed by Monell v. Department of Social Services, 436 U.S. 658

(1978). While a governmental entity may be considered a "person" for purposes of § 1983, it cannot be held liable for the acts of its employees on a *respondeat superior* theory. Id. at 691. A governmental entity may be held liable for constitutional violations only if those violations are the result of an official policy or custom. Id. at 694. See also City of Canton v. Harris, 489 U.S. 378, 389 (1989)(official policy or custom must be the "moving force" behind the alleged constitutional deprivation); Hafer v. Melo, 502 U.S. 21, 25 (1991)(because the real party in interest in an official-capacity suit is the governmental entity, "the entity's 'policy or custom' must have played a part in the violation of federal law").

Plaintiff's claims against Sheriff Thorp are based on: (1) the alleged failure of the Licking County Sheriff's Office to adequately investigate Plaintiff's complaint that the officers used excessive force during the course of his arrest; and (2) the alleged failure of the Licking County Sheriff's Office to adequately supervise and discipline its deputies for previous uses of excessive force. At the close of Plaintiff's case, Defendants moved for judgment on partial findings with respect to Plaintiff's claims against Sheriff Thorp. The Court reserved ruling on this issue until the close of the evidence.

Citing Marchese v. Lucas, 758 F.2d 181 (6th Cir. 1985), Plaintiff argues that a sheriff's failure to conduct a meaningful investigation into complaints of excessive force may be sufficient to prove that the sheriff acquiesced in the unconstitutional acts of his officers. The plaintiff in that case was arrested after he pointed a gun at a sheriff's deputy. After being taken into custody, the plaintiff was beaten twice in one day by officers at the jail. The court found that the shift officers knew that the plaintiff had been beaten when he was brought in and knew of plans for a second assault. The officers in charge also heard the second assault in progress

and made no effort to stop it.  Id. at 187.   Even though the judge at the arraignment ordered a

sheriff's representative to conduct an investigation into the alleged attack on the plaintiff, the

sheriff sought to cover up the incident.  He conducted no meaningful investigation and

disciplined none of the officers involved.

In upholding the jury's verdict in favor of the plaintiff, the Sixth Circuit stated, "[n]ot

only do the facts show that there was official toleration, (if not complicity in instigation) of the

midnight assault on the part of the command officers on duty at the station house that night; but

there was also subsequent concealment followed by a complete failure to initiate and conduct

any meaningful investigation on the part of the Sheriff himself."  Id. at 187-88.  The Court found

that this constituted sufficient evidence of "the existence of an unstated 'policy' of toleration of

illegal brutality toward any county prisoner who had threatened the life of a sheriff's deputy."

Id. at 184.

Although a sheriff's failure to conduct an investigation into a claim of excessive force

may permit an *inference* that the sheriff has an official policy or custom of tolerating

unconstitutional conduct, standing alone, it is not enough to establish liability.  See Morrison v.

Board of Trustees of Green Twp., 529 F. Supp. 2d 807, 825 (S.D. Ohio 2007) (citing  Tompkins

v. Frost, 655 F. Supp. 468 (E.D. Mich. 1987)).  As Judge Dlott held in Morrison:

> [I]nferring a municipal-wide policy based solely on one instance of
> potential misconduct runs dangerously close to "the collapsing of
> the municipal liability standard into a simple respondeat superior
> standard." Thomas v. City of Chattanooga, 398 F.3d 426, 432-33
> (6th Cir. 2005) (concluding that plaintiffs "must show not only that
> the investigation was inadequate, but that the flaws in th[e]
> particular investigation were representative of (1) a clear and
> persistent pattern of illegal activity, (2) which the Department
> knew or should have known about, (3) yet remained deliberately
> indifferent about, and (4) that the Department's custom was the

> cause [of the claimed injury]"); see also Brown v. Shaner, 172
> F.3d 927, 931 (6th Cir. 1999) (finding that summary judgment for
> the municipality was proper where plaintiffs produced no evidence
> indicating that the city had in the past failed to investigate and
> discipline the use of excessive force by its police personnel where
> such discipline was justified).

Morrison, 529 F. Supp.2d at 825.

Even though the Court has found that the Licking County Sheriff's Office failed to conduct any meaningful investigation into Plaintiff's complaint, Plaintiff has presented no evidence that this was indicative of a clear and persistent pattern of illegal activity which the Sheriff knew or should have known about. See Thomas, 398 F.3d at 432-33. Plaintiff notes that during the years 2001, 2002, 2003, and 2004, there are no documented citizen complaints involving use of excessive force by Licking County Sheriff's Office employees. (Pl.'s Ex. 26; Tr. at 384). Defendants failed to produce a list of citizen complaints for 2005, the year of Plaintiff's arrest and subsequent complaint. Sheriff Thorp testified that he could not find the list for 2005. (Tr. at 207-08, 383).

Plaintiff speculates that the Sheriff's Office has covered up other citizen complaints involving uses of excessive force, but has produced no evidence whatsoever to support that theory. Sheriff Thorp testified that he knew of no citizen complaints that were ignored. (Tr. at 376). He also testified that complaints of excessive force were "pretty few and far between" and that it was conceivable that there were no such complaints from 2001-2004. (Tr. at 384, 386). Based on the evidence presented, the Court finds that Plaintiff has failed to prove that the Licking County Sheriff's Office had a custom or policy of failing to investigate citizen complaints involving use of excessive force.

Moreover, unlike the sheriff in <u>Marchese</u>, Sheriff Thorp did not attempt to cover up this incident. In fact, he did order an investigation into Plaintiff's complaint. Major Mitchell reported back to him that he had conducted an investigation and that the complaint was unfounded. Sheriff Thorp did not know that Major Mitchell had failed to conduct any meaningful investigation and had failed to follow up with Plaintiff's attorney. Under the circumstances presented here, it cannot be said that Sheriff Thorp was deliberately indifferent to the rights of the citizens of Licking County. <u>See</u> <u>Thomas</u>, 398 F.3d at 432-33.

In addition, it cannot be said that the failure to conduct a meaningful investigation into Plaintiff's complaint was the cause of his constitutional injury. Once an individual's rights have been violated, a subsequent failure to conduct a meaningful investigation cannot logically be the "moving force" behind the alleged constitutional deprivation. <u>See</u> <u>Tompkins</u>, 655 F. Supp. at 472 ("[w]rongful conduct after an injury cannot be the proximate cause of the same injury"); <u>Fox v. VanOosterum</u>, 987 F. Supp. 597, 604 (W.D. Mich. 1997) (argument that decision not to investigate, made after alleged violation took place, somehow caused that violation, defies logic). For these reasons, the Court finds in favor of Sheriff Thorp on Plaintiff's claim concerning the alleged failure to investigate his complaint.

Plaintiff also maintains that the constitutional violations in this case were caused, in part, by the Licking County Sheriff's Office's acquiescence in previous uses of excessive force by Sergeant Carson and its failure to discipline Sergeant Carson for that misconduct. A governmental entity may be held liable under § 1983 for constitutional deprivations resulting from a failure to discipline employees who violate the constitutional rights of citizens. However, in order to establish the requisite "deliberate indifference," a plaintiff must generally show a

"history of widespread abuse that has been ignored." <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1354 (6th Cir. 1994). Plaintiff must show that the Sheriff knew of prior unconstitutional conduct on the part of his employees and failed to take corrective measures. <u>Stemler v. City of Florence</u>, 126 F.3d 856, 865 (6th Cir. 1997).

At trial, Plaintiff presented evidence of just one previous instance involving an allegation that Sergeant Carson had used excessive force. Sheriff Thorp testified that he was aware that in 2001, another deputy complained that Sergeant Carson had injured him by acting too aggressively during a training incident. (Tr. at 211). Because the training incident occurred four years prior to Plaintiff's arrest and it involved allegations of excessive force against a fellow officer rather than against a citizen, the Court does not give this evidence much weight.

This one previous incident is clearly insufficient to prove the kind of pattern of acquiescence needed to establish deliberate indifference on the part of the Sheriff's Office or to establish the requisite causal connection. The Court therefore finds in favor of Sheriff Thorp on this claim.

**V.     Damages**

Having determined that Deputy Kimble and Sergeant Carson violated Plaintiff's Fourth Amendment rights by using excessive force during the course of his arrest, and that Plaintiff's back injury was proximately caused by that use of excessive force, the Court must next determine how much money will reasonably and fairly compensate Plaintiff for his injury.

As noted earlier, Plaintiff has presented evidence of only $132.33 in out-of-pocket expenses incurred as a result of this incident, more specifically, the amount of his copayments for the chiropractic treatments received from Dr. Beckman through the date of the trial. The

Court also takes note that on the date of his arrest, Plaintiff refused medical treatment for his alleged injury and did not seek treatment of any kind until six to seven weeks after his arrest. The doctors have recommended that he continue conservative treatment. Although surgery was discussed as an option, Plaintiff has not proven by a preponderance of the evidence that any surgery will be necessary. In addition, Plaintiff is still able to play golf two or three times each week. The Court finds that, while Plaintiff's back injury was indeed the result of the unreasonable force used by Carson and Kimble in arresting Plaintiff, that injury was not so severe as to warrant a very large award of compensatory damages in this case.

The Court finds that $35,000 will reasonably and fairly compensate Plaintiff for the back injury he suffered when Sergeant Carson and Deputy Kimble engaged in the use of excessive force during the course of his arrest. Carson and Kimble are equally responsible for Plaintiff's injury and will be held jointly and severally liable for this amount.

A plaintiff in a § 1983 action may also recover punitive damages against a defendant in his individual capacity if the defendant acted with malicious or evil intent or in callous disregard of the plaintiff's constitutional rights. See Smith v. Wade, 461 U.S. 30, 56 (1983). In this case, the Court finds that punitive damages are not warranted. Although excessive force was used, there is no evidence that the officers acted with malicious or evil intent or in callous disregard of Plaintiff's Fourth Amendment rights.

## VI.     Conclusion

For the reasons set forth above, the Court **DENIES** Defendants' motion to exclude Plaintiff's Exhibits 15, 16, and 25 (Doc. 60), Defendants' motion to exclude Plaintiff's Exhibits 21-23 (Doc. 61), and Defendants' motion to exclude Plaintiff's Exhibit 24 (Doc. 62). The Court

**GRANTS IN PART and DENIES IN PART** Defendants' motion to exclude Plaintiff's

Exhibits 26-28 (Doc. 63).[16]

In addition, for the reasons stated above, the Court **GRANTS IN PART and DENIES**

**IN PART** Defendants' oral motion for judgment on partial findings. The Court finds that

Sergeant Loy is entitled to qualified immunity on the claims brought against him in his

individual capacity, and judgment will be entered in his favor. However, because Sergeant

Carson and Deputy Kimble did use excessive force during the course of Plaintiff's arrest, and

because the law was clearly established, Carson and Kimble are not entitled to qualified

immunity on the claims brought against them in their individual capacity.

Plaintiff has failed to prove by a preponderance of the evidence that these constitutional

violations were caused by a policy or custom of the Licking County Sheriff's Office. Sheriff

Randy Thorp is therefore entitled to judgment in his favor on Plaintiff's claims brought against

him in his official capacity.

The Court finds that Sergeant Chad Carson and Deputy Kris Kimble, while acting under

color of state law, used excessive force against Plaintiff during the course of his arrest, violating

Plaintiff's rights under the Fourth Amendment to the Constitution of the United States, and

causing injury to Plaintiff's back. Pursuant to 42 U.S.C. § 1983, the Court awards compensatory

damages to Plaintiff in the amount of $35,000. Chad Carson and Kris Kimble are jointly and

severally liable for this judgment. The Clerk is directed to enter judgment in accordance with

this Order.

---

[16]  As noted earlier, the exhibit numbers were changed between the time the Amended
Final Pretrial Order was filed and the time of trial. The exhibit numbers listed here refer to the
exhibit numbers contained in the motions in limine.

**IT IS SO ORDERED.**


Date: February 2, 2009                    **/s/ John D. Holschuh**
                                          John D. Holschuh, Judge
                                          United States District Court